Bradbury, J.
1. The plaintiff in error, after two trials in the Clermont county court of common *333 pleas, both of which resulted adversely to him, sought and obtained a change of venue. The cause was removed to the adjoining county of Brown, where he was, for the third time, placed upon trial upon an indictment charging him with'murder in the first degree.
After the jury had been impanneled in Brown county for the trial, counsel for the state moved for, and, over the objection of plaintiff in error, obtained an order that the jury be sent to Clermont county, in which the homicide was committed, to view the place where' it occurred. Thereupon the jury in a body, under the charge of an officer, was conducted to that place, and, by a person appointed by the court, their attention directed to such objects as was thought might aid them in understanding the evidence to be submitted to their consideration. The - court, in the order directingthe view, also directed that the prisoner, if he desired, should be taken along in charge of an officer. He chose to accompany the jury, as also did his counsel and the prosecuting attorney.
The plaintiff, however, having resisted the motion for a view, and excepted to the order allowing it, should not be regarded as waiving his objection to it because, with his counsel, he accompanied the jury when he found that the view was to be made notwithstanding his resistance.
. What power is vested in a court of common pleas to order a view of the locus criminus in the absence of a statute, we need not consider, for in this state the subject is regulated by the legislature. Section 7283, Revised Statutes, provides that, “Whenever in the opinion of the court it is proper for the jurors to have a view of the place at which any material fact occurred, it may order them to be con *334 ducted.” * * * The language employed does not limit the power to order a view to places within the county. The words are broad enough to authorize a jury to be sent anywhere, and no reason is apparent why a jury might not be sent to any place where a material fact occurred, if within the jurisdiction of this state. The statute, we think, authorized the court of common pleas to send the jury to Clermont county to view the place where the homicide occurred.
2. O. P. Griffith, Esq, Prosecuting Attorney, his assistant, John M. Markley, Esq., the plaintiff in.error, and two of his counsel, W. W. Young, Esq., and W. W. Dennison, Esq., accompanied the jury when it made the view, and the plaintiff in error contends the irregularities occurred while the view was being had, for which the jury should have been discharged; and upon the return of the jury, and before any further steps were taken in the trial, he moved the court for an order discharging it, which was overruled. The several matters, constituting the alleged irregulaities, were set forth in affidavits filed on behalf of the plaintiff in error, and in counter affidavits presented by the state, which, upon the overruling of the motion to discharge the jury, were embodied in a bill of exceptions. If the irregularities, disclosed by the affidavits filed on behalf of the plaintiff, were such as to require the discharge of the jury, and the affidavits presented by the state showed that the alleged irregularities were not sufficient to warrant such discharge, this court must assume, in support of the ruling of the court of common pleas, that it found the facts in accordance with the affidavits of the latter, and should not disturb its ruling in this regard, unless this finding was mani *335 festly against the weight of the evidence. However, if the facts, as they were disclosed by the affidavits filed by the state, show, fatal irregularities for which the jury should have been discharged, it was error to overrule the motion. There was no great conflict in these affidavits, and in passing upon this motion the court may well have taken the statements made by E. G. Booso, who was appointed to accompany the jury and point out the premises, as disclosing a correct history of what transpired in its presence on that occasion.
He states that after the jury and those who accompanied it, arrived on the premises, he, at the request of counsel for the state, and for the plaintiff in error, caused the owner of the team and the wagon in which the deceased was riding, when shot, to drive the team and wagon to the place of the tragedy; that counsel thenagreed that the deceased, when shot, fell from the wagon to the earth in the pike, at a point fifty feet from a certain bridge, and to ascertain the point where the body fell, the affiant, at the joint request of counsel on both sides, measured the distance with a tape line, and made a mark to indicate where the body lay, and by like consent and request caused the wagon to be driven near to this point, as indicated by one of the counsel for plaintiff in error ; then the owner ' of the wag’on, a boy and a third person, were placed in the wagon, the jury conducted to the east end of said bridge, O. P. Griffith, prosecuting attorney, was placed at a point where the plaintiff in error had stood at the time the shot was fired, a gun placed in his hands and pointed in the direction of the man and boy, and the attention of the jury directed to the position of such persons; that then *336 the jury was moved up to the Wagon, and the affiant, at the request of counsel for plaintiff in error, took the gun and placed the hammer thereof at different points upon the front wheel and other parts of the wagon. This entire transaction occurred in the presence of the plaintiff in error. The several acts were done at the request of his counsel, made alone or jointly with counsel for the state. The theory of the defense was that the fatal shot was an accident, and the experiments made, and positions in which the several actors were placed were intended, we must presume, to render intelligible, to the jury the statements of the witnesses that bore upon that theory. The plaintiff in error at the time made no objection to these acts, performed, as we have already seen, in his presence and at the request of his counsel. He now claims that the owner of the team and wagon, Malott, aiid the prosecuting attorney, did not stand indifferent between himself and the state, for the reason thatMalottwas the man who harbored his boy, the deceased, and a hostile witness at his trial, and that the position of the prosecuting attorney was necessarily hostile to him. Whatever the feelings of these two men may have been, no unfairness was exhibited by either in the course of the view. He also claims'that he did not know that he had a right to object to the part taken by Malott .and the prosecuting attorney, or to any of the proceeding’s had at the view; but, as two of his counsel were there with whom he could have communicated at any moment, this objection is entitled to no substantial consideration, for undoubtedly the slightest intimation from him to them of any opposition to, or dissatisfaction with, the proceeding’s, would have received instant at *337 tention. We can discover nothing, however, in the course of the proceedings had during the view, that prejudiced any substantial right of the plaintiff in error; but if there had been, the old notion that a defendant in a capital ease can waive no right is fast becoming obsolete. Where he, with perfect freedom, may object to a course of proceeding, no good reason is perceived why his acquiescence in it should not bind him; much more so, where the proceedings are had in good faith, in his presence, and at the request of his counsel, under circumstances, affording him ample opportunities for objecting to them, if they are not satisfactory to him.
We find no error in overruling the motion to discharge the jury.
3. That the deceased was the son of the plaintiff in error, and came to his death by a gun shot fired «from a gun in the hands of the latter, is not disputed. The son left home and was working for a neighbor, the man Malott, who has already been mentioned, and was on Malott’s wagon with him and some members of his family, when the fatal shot was fired. Father and son had had sharp controversies over the son’s refusal to return home, in which Malott had participated. The theory of the state, briefly is, that the father through these controversies had become highly exasperated at, and embittered towards, both his son and Malott, and seeing his son pass by his, the father’s house, in Malott’s wagon, with Malott’s family, on his way to the home of the latter, his feelings of animosity were aroused, and seizing a musket, followed after and overtook the wagon, and purposely shot, either at Malott or the boy, killing the latter.
*338 The theory of the defense, on the contrary, is that the deceased, a youth of fifteen or sixteen years of age, was being debauched by female members of Malott’s family. That Malott’s wife was a woman of bad character, with whom, as well as with the daughter, the boy was having illicit relations, and that the plaintiff in error, to reclaim his son from these immoral surroundings, followed the wagon, in which the «on, together with Malott and the latter’s family, were riding, with a view to urg’d the latter to return home; and took with him a musket to protect himself from Malott, who, he had just grounds to apprehend, might violently interfere, to prevent the return of the boy; and that when he approached the wagon in which the boy and Malott, and the latter’s family were riding, the musket, either by striking some part of the wagon, or in some other way unknown to the plaintiff in error, was accidentally discharged and the boy thus killed.
To support this contention, plaintiff in error offered evidence tending to prove the general bad character for chastity, of Malott’s wife, which evidence was rejected.
This, we think, was error. The evidence tended to contradict the contention of the state that the plaintiff in error was actuated by malice and a purpose to kill his son or Malott. Fathers, with a just sense of paternal obligations, may be expected to strenuously exert themselves to remove a son, hardly yet entering upon the threshold of manhood, from the demoralizing influence of depraved women. If the plaintiff in error could establish the fact that his son was thus situated, it would tend to show that in pursuing after the wagon in which his son was riding, he was actuated by the *339 natural feeling-s of a father, rather than by a purpose to take the life of his son or Malott, thereby rendering- more probable his theory of an accidental discharge of the gun. ' And jf, in addition, he could establish that he had cause to apprehend that an attempt to reclaim his son might be resisted by Malott, it would show a motive for taking with him the gun, other than a design to kill either Malott or his son.
True, he was permitted to testify that he had been told by his son that the latter and Malott’s wife had been criminally intimate; and that on one occasion he had, himself, taken his son and a daughter of Malott in the act' of copulation. He was permitted to do this, not to establish the bad character of Mrs. Malott, or any acts of intimacy between herself and the boy, or the daughter and the boy, but as tending to show the state of his mind at the time of the homicide. This, no doubt, he had a right to do; for, as a father, who fully believed, though mistakenly, that his youthful son was being debauched, he might be expected to act precisely as if his belief was true. So that, however chaste, Mrs. Malott and her daughter may in fact have been, the plaintiff in error had a right to show that he honestly believed the contrary, as explanatory of his conduct , in seeking to reclaim the boy, as, he contended, was his purpose on the fatal occasion. But this was not the full measure of his right. In the nature of things it would be difficult to obtain other evidence of his mere belief than his own statement. His own statements were made in a matter involving his life on account of a most horrible accusation, the murder of his own son. He, in the estimation of a jury, would be deemed to labor under a strong temptation to find *340 some circumstances of extenuation or complete exculpation, and his unsupported evidence might, or probably would, be viewed with great doubt; and if the wife and daughter, both, were of irreproachable character, his tale would be deemed a fiction created by a desperate man, pressed to extremity for an excuse to palliate an atrocious crime. Where one' finds his youthful son in a bawdy-house, or under the influence of a notoriously immoral woman, and in an effort to reclaim Mm, takes his life, we think it of the utmost importance, upon an issue of whether he casually or purposely killed him, that he should be allowed to show the actual character of the surroundings of the boy. If he could establish that these surroundings were clearly and unmistakably vicious, a motive for his conduct, although he took extreme measures to reclaim the boy, would be shown consistent with parental duty, and tend to rebut other circumstances, if any, that tend to prove malice or a purpose to take life.
It is one thing to show that he believed, though falsely, that his son was so surrounded, but quite another to show that the son was in fact thus situated. The distinction would be wide, if for no other reason, because of the greatly increased probability of a jury giving credence to his theory, if it appeared that his son was in fact being-debauched. If he could establish by independent evidence, this fact, or that his son was in a situation in which that result was probable, his theory would be placed on a much more substantial basis, than it would be if it rested upon his own false belief that such were the facts. The jury might readily believe that his alleged motive to reclaim his boy was bona fide, if it appeared that the boy *341 was actually associating day by day with depraved women, while they would reject it altogether, if the women were virtuous and his alleged motive rested upon his assertion of av, false belief that they were vicious and immoral.
4. The plaintiff in error denied that he entertained a purpose to kill, anyone, or even intended to fire the gun, when it was discharged; and gave evidence tending to prove that having taken the gun with him merely to protect himself from violence in case his efforts to reclaim his son should be resisted with extremity, it was discharged by means unknown to him and his son thus killed.
In this connection the plaintiff in error requested the court to charge the jury that: “The burden of proof is not in this' case upon the defendant to show that the gun was discharged by accident, or force exerted by other persons than the defendant, but that it is incumbent upon the state to establish, to the satisfaction of the jury,' and beyond a reasonable doubt, that the defendant deliberately discharged the gun with premeditation and motive before you can find him guilty of murder in the first deg’ree.”
The learned judge declined to give this proposition to the jury, but on the contrary, in a charge of remarkable clearness and brevity, and in other respects, stating the rules of law applicable to the facts, correctly, laid down the converse of the proposition requested. This we think was error.
The statutes of Ohio make an intent to kill an essential ingredient of the crime of murder, in either degree, except in the case of death following from maliciously placing obstructions on a railroad track, etc. Revised Statutes, *342 sections 6808, 6809, 6810. The intent or purpose, to kill, being an essential constituent of the offense, should be averred and proven. Fouts v. The State, 8 Ohio St., 98; Kain v. The State, Ib., 306; Hagan v. The State, 10 Ohio St., 459. This purpose, like every other material averment of the indictment, is put in issue by the plea of not guilty and to authorize a conviction must be proven beyond a reasonable doubt. Where the state has shown that the death was the result of design, purpose, or intent —and these terms in this relation are synonymous— then the notion of accident is necessarily excluded. That which is designedly or purposely accomplished cannot, in the very nature of things, be accidental. Therefore, when the plaintiff in error introduced evidence tending to prove that the gun was accidentally discharged, he was merely controverting the truth of the averment in the indictment that it was purposely discharged.
This was not an affirmative defense, analogous to a plea of confession and avoidance in civil controversies, like that of one who admits that he purposely killed his assailant, or purposely used a deadly weapon which produced that result, but contends that he was justified in taking the life of his assailant, in defense of his own person. Nor like that of one who, admitting that he purposely took the life of another, sets up as a defense his insanity.
As respects thesé last two defenses, this court has uniformly held that the burden of maintaining them was on the defendant. Clark v. State, 12 Ohio, 494; Loefner v. State, 10 Ohio St., 598; Bergin v. The State, 31 Ohio St., 111; Bond v. The State, 23 Ohio St., 349; Silvus v. State, 22 Ohio St., 90; Weaver v. State, 24 Ohio St., 584. But in none of these cases *343 is it held that the state, in the first instance, is not bound to establish beyond a reasonable doubt every fact necessary to- constitute the crime charged. In Weaver v. The State, 24 Ohio St., 589, White, J., refers with seeming approval to the fact that the court of common pleas, in its charge, told the jury that the state was required to establish beyond a reasonable doubt the facts necessary to constitute the offense. We are not called upon at this time to declare what presumptions might arise, and their effect, from the mere fact that one person had killed another, wholly unexplained by any evidence of attending circumstances; for, in the case before us, the homicide was committed in the presence of a number of persons, each of whom gave to the jury his version of the affair. The plaintiff did the same. In doing this, he set up no other defense than that the state had not established, beyond a reasonable doubt, the facts constituting the crime charged against him, one of which facts was an intent to kill. The cases of Commonwealth v. York, 9 Metcf. (Mass.), 93; Commonwealth v. Webster, 5 Cush. (Mass.), 295, and Davis v. The State, 25 Ohio St., 369, are cited in support of the ruling of the common pleas court.
In Commonwealth v. York, supra, death resulted from a wound, inflicted by the prisoner with a dirk knife. No suggestion that it was accidentally inflicted appears in the case. The question was whether the act was done in self defense, or in the heat of passion, so as to exclude the presence of malice, and thus render it justifiable in the first case or reduce the homicide to manslaughter in the second case. The wound had been willfully and voluntarily inflicted. On page 102, the court say: “The distinguishing characteristic of murder is homicide with malice aforethought, express, or *344 implied by law. The effect of the rule presented to the jury was, that it was proved, beyond a reasonable doubt, that the defendant had willfully and voluntarily inflicted a mortal wound upon the deceased, malice was to be inferred from this act, unless such facts were proved by a preponderance of the evidence, as would extenuate the homicide and reduce it to manslaughter. This rule seems to rest on well settled principles, and to be supported by a great weight of authorities. A sane man, a voluntary agent, acting upon motives, must be presumed to contemplate and intend' the necessary, natural and probable consequences of his own act. If, therefore, one voluntarily or willfully does an act which has a direct tendency to destroy another’s life, the natural and necessary Conclusion is that he intended so to destroy such person’s life.” * * This language, while it supports the ■ proposition that one should be held to intend to do that which his deliberate acts necessarily or naturally tend to produce, it affords no support for the contention that he shall be held to intend ' the consequences of all his acts, irrespective of . whether those acts were voluntary or involuntary, and that the burden is on him to show that he did not.
The facts in Davis v. The State, 25 Ohio St., 369 (supra), are meagerly reported, but they present none of the features of accident. The defense, seems to have been founded upon the excessive intoxication of the prisoner, and it was in that connection that the court instructed the jury that, ‘ ‘where the fact of killing has been proved, malice must be intended, and all circumstances of justification and extenuation are to be made out by the accused unless they appear from the evidence ad *345 duced against him.” And this court held that no error appeared. Incapacity resulting from intoxication is not unlike that arising from insanity, and where it does not appear in the evidence introduced by the state, but is presented to the jury by the defendant as an excuse or justification, no reason is apparent why it should be treated more leniently than insanity. The court was not considering the question of intent, in hbmicide, but that of malice, a term frequently of technical import in criminal jurisprudence, and in construing the language of the court, reference should be had as to the question under consideration at the time; and when this is done, that above quoted affords no support to the proposition, that upon an issue in a criminal cause of whether a homicide was accidental, or designed, the burden of proof was upon a defendant, who claimed it to be accidental.
Commomoealth v. Webster, 50 Mass., 295 (supra), was the celebrated case involving the murder of Dr. Parkman. No intimation that his death resulted from an accident was ever made. The language used by Chief Justice Shaw, was to explain to the jury the difference, between manslaughter and murder, according to the principles of the common law. The last he defines as “the killing of any person in the peace of the commonwealth with malice aforethought, either express or implied,” while manslaughter is “.the unlawful killing of another without malice. ” * * * Ib., 305. The characteristic distinction between murder and manslaughter, he says, “is malice express or implied. ” He then proceeds: “Upon this subject, the rule as deduced from the authorities is that the implication of malice arises in every case of intentional homicide; and the fact of killing being first *346 proved, all the circumstances of accident, necessity or infirmity are to be satisfactorily established by the party charged, unless they arise out of the evidence produced against him. If there are, in fact, circumstances of justification, excuse or palliation, such proof will naturally indicate them. But where the fact of killing is proved by satisfactory evidence and there are no circumstances disclosed, tending to show justification or excuse, there is nothing to rebut the natural presumption of malice. The rule is founded on the plain and obvious principle, that a person must be presumed to intend to do that which he voluntarily and wilfully does in fact do. ” * * * Ib., 305. It is clear that the distinguished jurist who employed this language, did so with reference to the case before him, and had in mind not an accidental, but a willful homicide, and no wise conflicts with views we hold. He was asserting, and explaining to the jury, that one is presumed to contemplate the consequences of his voluntary and wilful act, but neither from the history of that celebrated case, nor the language of that great judge, when all of it is considered, can it be inferred that he intended to hold that a man shall be taken to contemplate the consequences of an act that he never designed. How can a man be held to contemplate the consequences of an act, when he did not contemplate the act itself ?
The rule has been announced in this state more than once, in general terms, that from the act of killing malice might be inferred; but in all of them the intent to kill had been established, if that intent was an ingredient of the crime. It is also an established canon of the law of this state that one must be held to contemplate' the consequences of *347 his voluntary and deliberate acts, but as we have seen, it does not follow from these principles that one must be held to intend the consequences of involuntary acts, and assumes the burden of proving that he did not. But had this court gone a step farther and held generally that from the mere fact, standing alone, uninterpreted by a single circumstance, that one person had killed another, the intent to kill should be presumed, we should certainly pause and consider, before applying that stern rule to the case of father and son. Rare, indeed, in the ordinary walks of life, are the instances where a son has been maliciously and intentionally killed by his father. Among the strongest affections that are founded upon our social relations is the parental one. The welfare and happiness of the child are main objects of paternal solicitude. To destroy a child is so contrary to the promptings of nature, that it may be doubted that, if the presumption of an intent to kill should be held to follow an unexplained homicide generally, whether it should 'be applied where such special relations exist, relations which usually bind the parties to each other by the strongest bonds of natural affection, although occasionally, when thoroughly estranged, extreme bitterness and exasperation may usurp the place of those natural affections. We think the proposition as to the degree of proof required to establish the intent to kill, contained in the instructions requested by the plaintiff in error, was sound, and as it was pertinent to the issue being tried, should have been given to the jury, and to refuse to give it was error prejudicial to his defense.

Judgment reversed.